

FILED
2017 Mar-17  AM 10:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

DONNA LEAH LANDIS,           )
                             )
        Plaintiff,           )
                             )
    vs.                      )          3:15-cv-1782-LSC
                             )
CAROLYN W. COLVIN,           )
Commissioner of Social Security, )
                             )
        Defendant.           )

## MEMORANDUM OF OPINION

### I.    Introduction

The Plaintiff, Donna Leah Landis, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for a period of disability and Disability Insurance Benefits.  Plaintiff timely pursued and exhausted her administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff was fifty years old at the time of the Administrative Law Judge's ("ALJ's") decision, and she has a high school education.  (Tr. at 110, 148).  She has past work as a produce manager at a grocery store from February 1991 through July 26, 2012, when she stopped working. (Tr. at 133, 148-49). Plaintiff reported that from October 4, 2011, to July 26, 2012, she worked reduced hours: 34 hours

per week. (Tr. at 136.) Plaintiff claims that she became disabled on August 22, 2011, which is the date that she had surgery on her neck (an anterior cervical discectomy and fusion), due to spinal stenosis, exostosis, bone spur, cervical disc degeneration, tendinopathy of rotator cuff, and tear of the supraspinatus tendon. (Tr. at 147).

The Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled and thus eligible for DIB or SSI. *See* 20 C.F.R. §§ 404.1520, 416.920; *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The evaluator will follow the steps in order until making a finding of either disabled or not disabled; if no finding is made, the analysis will proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step requires the evaluator to determine whether the plaintiff is engaged in substantial gainful activity ("SGA"). *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the plaintiff is not engaged in SGA, the evaluator moves on to the next step.

The second step requires the evaluator to consider the combined severity of the plaintiff's medically determinable physical and mental impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational

requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 will result in a finding of not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The decision depends on the medical evidence contained in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971) (concluding that "substantial medical evidence in the record" adequately supported the finding that plaintiff was not disabled).

Similarly, the third step requires the evaluator to consider whether the plaintiff's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the criteria of a listed impairment and the durational requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 are satisfied, the evaluator will make a finding of disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the plaintiff's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluator must determine the plaintiff's residual functional capacity ("RFC") before proceeding to the fourth step. *See id.* §§ 404.1520(e), 416.920(e). The fourth step requires the evaluator to determine whether the plaintiff has the RFC to perform the requirements of her past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the plaintiff's impairment

or combination of impairments does not prevent her from performing her past relevant work, the evaluator will make a finding of not disabled. *See id.*

The fifth and final step requires the evaluator to consider the plaintiff's RFC, age, education, and work experience in order to determine whether the plaintiff can make an adjustment to other work. *See id*. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the plaintiff can perform other work, the evaluator will find her not disabled. *Id.; see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the plaintiff cannot perform other work, the evaluator will find her disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

Applying the sequential evaluation process, the ALJ found as an initial matter that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016. (Tr. at 12.) The ALJ's step one finding appears contradictory. He determined that Plaintiff "has not engaged in SGA since August 22, 2011, the alleged onset of her disability." (*Id.*) He then noted that she "worked after the alleged disability onset date but this work activity did not rise to the level of [SGA]." (*Id.*) Curiously, he then stated that she "returned to work at her prior job on October 3, 2011 following the neck surgery and continued to work *making SGA* until she injured her shoulder and last worked on July 26, 2012." (*Id.* (emphasis added)). His conclusion that her work from October 2011 to July 2012

constituted SGA was based on her earnings record which he noted indicated that in 2012 she earned $18,160.45. (*Id.*) In any event, the ALJ apparently found in Plaintiff's favor at step one of the sequential evaluation, thus allowing her to proceed to the next step, and neither party raises any issues with regard to his finding at step one.

At step two, the ALJ found that Plaintiff's "cervical microdiskectomy and fusion at C4-5 followed by a separate injury to the shoulder which required surgery on July 23, 2013," are "severe" based on the requirements set forth in the regulations.  (*Id.*) However, he found at step three that these impairments neither meet nor medically equal any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. (*Id.*) The ALJ did not find Plaintiff's allegations to be fully credible, and he determined that Plaintiff retains the RFC to perform light work "except no more than occasional overhead lifting." (Tr. at 13.)

According to the ALJ at step four, Plaintiff is unable to perform any of her past relevant work, she is "closely approaching advanced age," she has at least a high school education, and she is able to communicate in English, as those terms are defined by the regulations. (Tr. at 16-17.) The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that

the claimant is 'not-disabled', whether or not the claimant has transferable job skills." (Tr. at 17.) The ALJ enlisted a vocational expert ("VE") to provide testimony as to whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. (*Id.*) At step five, the ALJ found that there are indeed a significant number of jobs in the national economy that Plaintiff is capable of performing, including "occasional lifting overhead" storage facility rental clerk, fitting room attendant, and parking lot attendant. (*Id.*) The ALJ concluded that Plaintiff has not been under a disability as defined by the Social Security Act from August 22, 2011, through the date of the decision. (Tr. at 18.)

## II.    Standard of Review

This Court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied.  *See Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)).  This Court gives deference to the factual findings of the Commissioner, provided those findings are

supported by substantial evidence, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

Nonetheless, this Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)). "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the proof preponderates against the Commissioner's decision, it must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400 (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

However, no decision is automatic, for "despite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881,

883 (11th Cir. 1984)).   Moreover, failure to apply the correct legal standards is grounds for reversal.  *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III.   Discussion

Plaintiff argues that the Commissioner's decision should be reversed and remanded for two reasons: (1) the ALJ erred in finding that she was not disabled for any one consecutive twelve-month period and (2) the ALJ erred in finding her subjective complaints of pain not credible.

### A.   Disability for a Consecutive Twelve-Month Period

There are two separate injuries involved in this case. The first injury occurred on June 4, 2011, when Plaintiff picked up a case of cabbage at her job as a produce manager at a grocery store. (Tr. at 194, 214.) She felt pain in the back of her neck but continued the workday. (*Id.*) However, by that evening the pain was bad enough that she presented to MedPlus where she was diagnosed with muscle strain and treated with anti-inflammatory medication. (*Id.*) However, her symptoms did not respond to conservative measures. (*Id.*) A Magnetic Resonance Imaging ("MRI") scan showed spondylosis at C5-6 with some spondylophyte formation toward the left side and significant posterolateral disk protrusion with spondylophyte formation that results in significant stenosis. (Tr. at 214.) Plaintiff used medication to manage her pain and was told she could return to work as long

as she did not lift over twenty pounds and avoided repetitive overhead activity. (Tr. at 215.) At an August 3, 2011, follow up, Plaintiff reported that her symptoms had not improved. (Tr. at 210.)

On August 22, 2011, Plaintiff was admitted to Huntsville Hospital complaining of neck pain radiating to her right shoulder and bicep with numbness in the right thumb and index finger. (Tr. at 192.) She was diagnosed with neck pain and upper extremity pain due to cervical spondylotic stenosis with disc protrusion at C4-5, C5-6. (*Id.*) It was noted that she had tenderness in her neck and positive impingement testing in the right shoulder but otherwise had a full range of motion in the shoulders, elbows, and wrists. (*Id.*) That day, Dr. Cyrus Ghavam, a surgeon, performed an anterior discectomy and fusion on the C4-5 and C5-6. (Tr. at 192, 197-99, 252-54). This resulted in Plaintiff reporting that she had good relief of upper extremity pain, and she was discharged the next day, August 23, 2011. (Tr. at 192.) Plaintiff was told to walk daily and avoid anti-inflammatories and tobacco/nicotine products. (*Id.*)

At a follow up on August 30, 2011, Dr. Ghavam noted Plaintiff was doing well with good relief of right upper extremity pain. (Tr. at 208). She had full upper extremity muscle strength. (*Id.*) She was to return to light activity for four weeks and regular work at her existing job in eight weeks. (*Id.*) Dr. Ghavam reminded her

of the adverse effect of smoking and fit Plaintiff with an external bone growth stimulator. (*Id.*)

Plaintiff returned to work on October 4, 2011, although she reported that she started working reduced hours: 34 hours per week. (Tr. at 206.) At a follow up with Dr. Ghavam on October 14, 2011, she reported having increasing pain but no specific injury. (*Id.*) She was continuing to smoke and not using the bone growth stimulator. (*Id.*) She had a satisfactory range of motion in her neck and an intact neurological examination with full upper extremity muscle strength. (*Id.*) Her surgical hardware was in good position and x-rays showed a stable fusion. (*Id.*) Dr. Ghavam opined that she had developed myofascial pain as a result of increased activity. (*Id.*) He prescribed physical therapy and opined that Plaintiff could gradually increase her activities at work and should be able to perform regular work. (*Id.*)

At a follow up in December 2011, Dr. Ghavam noted Plaintiff was continuing to smoke and not using the bone growth stimulator. (Tr. at 204). She had some relief with physical therapy. (*Id.*) She was complaining of achiness in her neck with diffuse pain in the right arm with paresthesias, weakness, and numbness. (*Id.*) However, his examination showed no neurological deficits and no fasciculation or atrophy. He noted that she could perform regular work with no restrictions. (*Id.*)

Plaintiff continued to complain of neck pain. Therefore, workers' compensation referred her to Dr. Robert L. Hash, II at the SportsMED Orthopedic Surgery and Spine Center, where she was treated on four occasions from April 9, 2012 through October 3, 2012. (Tr. at 226-36). At the first visit Plaintiff reported to Dr. Hash that she had continued to work without restrictions since the initial onset of symptoms on June 4, 2011. (Tr. at 226). Plaintiff had normal muscle tone in her upper extremities with no atrophy (Tr. at 227). Dr. Hash diagnosed cervical disc degeneration, displacement, cervical radiculopathy, neuritis not otherwise specified, and tingling/numbness (*Id.*) Dr. Hash ordered an MRI, EMG, and x-rays, which showed no major nerve root compression, mild carpal tunnel syndrome on the right, and no soft tissue swelling. (Tr. at 229). On April 27, 2012, Plaintiff had nerve conduction studies which showed "the possibility of mild early right median neuropathy at or distal to wrist (carpal tunnel syndrome)." (Tr. at 246). The conclusion was that electrophysiologically, there was no carpal tunnel syndrome on the left side, and there was no right ulnar neuropathy or cervical radiculopathy. (*Id.*) Dr. Hash opined on April 30, 2012, that Plaintiff could perform her regular work as a produce manager which was light to medium exertional work. (Tr. at 229).

On August 22, 2012, Plaintiff saw Dr. Hash again, and she reported that on July 26, 2012, when she was raising her hands overhead at work her neck "got stuck," that she has limited range of motion in her neck, and that her right arm felt "dead and painful." (Tr. at 231, 234.) Plaintiff told Dr. Hash that her pain never improved after her prior surgery and that it had worsened after this new incident (Tr. at 233). Dr. Hash said he would consider this an exacerbation of the previous injury and ordered testing. (*Id.*) He also noted that the Workman's Compensation nurse reported that a different doctor had discharged Plaintiff from his care because she violated the narcotic contract. (*Id.*) An MRI of Plaintiff's cervical spine conducted at that time showed post-surgical fusion changes extending from C4 to C6 without recurrent disc herniation with no detrimental change from the previous April 2012 MRI which had occurred before the second injury. (Tr. at 242-43). A September 17, 2012, computerized tomography ("CT") of the cervical spine showed evidence of prior cervical fusion with some spurring identified at the C4-5 interspace. (Tr. at 240). A cervical myelogram showed no high-grade cervical stenosis. (Tr. at 239).

At a follow up on October 3, 2012, Dr. Hash recommended an epidural steroid injection at C5-6, and if it did not provide relief, he recommended surgery. (Tr. at 235). On October 23, 2012, Dr. Michael Cosgrove performed a C7-T1

interlaminar Epidural Steroid Injection and Fluoroscopy. (Tr. at 250-51). Thereafter, Plaintiff reported no improvement. (*Id.*)

Thus, at Dr. Hash's referral, Dr. John J. Greco, an orthopedist, treated Plaintiff from November 2012 through April 2013. (Tr. at 269-77). At their first visit on November 8, 2012, Plaintiff denied any problems with her right shoulder prior to the July 26, 2012, work injury. (Tr. at 274). Dr. Greco assessed right shoulder impingement with tendinosis and partial thickness rotator cuff tear and right shoulder pain. (*Id.*) He put Plaintiff on modified work duty, opining that she could lift and carry one to three pounds and push or pull ten to twenty pounds with no repetitive overhead activity. (*Id.*) Dr. Greco felt that she had two separate issues with the shoulder being separate from the neck, stating, "Her shoulder has been painful in and around the shoulder and that is different from what she was having issues with before." (*Id.*)

At a visit on December 6, 2012, Dr. Greco recommended going forward with surgery. (Tr. at 272.) He again noted, "I do think that more of her problems [sic] is her shoulder than her neck . . ." (*Id.*) Plaintiff underwent a decompression and AC joint resection surgery in January 2013 and followed with several weeks of physical therapy at Shoals Orthopedics Physical Therapy from January 25, 2013 through March 12, 2013. (Tr. at 271, 302-320). Therapy notes indicated that Plaintiff

performed very slowly with several rest breaks and actively resisted exercise which limited progress with range of motion. (Tr. at 319-20.)

Dr. Greco examined Plaintiff's shoulder post-surgery on February 7, 2013, noting some pain on the extremes but stated that she was neurovascularly intact and the wounds were healing nicely. (Tr. at 271.) He stated, "I think a lot of the shoulder issue is better. She does still have some of a neck issue and she very well have [sic] two separate issues but I felt all along we needed to get the shoulder settled down . . ." (*Id.*) She was to perform only light duty, lifting and carrying one to three pounds and pushing and pulling ten to twenty pounds with no repetitive overhead activity. (*Id.*) She was to continue physical therapy and take Percocet. (*Id.*) On March 14, 2013, Dr. Greco noted that Plaintiffs "guards" her shoulder and instructed that she was to continue current work restrictions. (Tr. at 270).

On April 24, 2013, Dr. Greco's office examined Plaintiff and completed a functional capacity evaluation ("FCE"). (Tr. at 324.) The FCE recommended that she could perform a job at the medium level of exertion with the following additional limitations: "exerting 20 to 50 pounds of force occasionally, or 10 to 25 pounds of force frequently, or greater than negligible up to 10 pounds of force constantly to move an object." (*Id.*) Plaintiff was also limited to lifting 45 pounds from the floor to waist, 45 pounds from waist to waist, and 35 pounds from waist to

eye level, carrying 50 pounds for 50 feet, and pushing or pulling 90 pounds. (*Id.*) She was able to frequently stand, walk, sit, bend, squat, reach overhead, grasp, and could constantly reach horizontally. (Tr. at 331).

Two days later, on April 26, 2013, Dr. Greco saw Plaintiff again. He noted Plaintiff was three months out from her decompression and joint resection surgery and had much better motion and had definitely improved. (Tr. at 269). He prescribed her "one last" prescription for Percocet and released her from his care with the modified duty described in the FCE that was completed two days prior. (*Id.*) He noted that she was still battling issues with her neck and he would see her again if need be. (*Id.*)

Based on the aforementioned medical records, Plaintiff contends that she had one continuous disabling event that began in June 2011 and continues up through the date of the ALJ's decision denying benefits in 2014. Thus, according to Plaintiff, the ALJ erred in finding that the record did not contain any one period of disability for a consecutive twelve months.

The definition of disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C.

§ 423(d)(1)(A). "To meet this definition, [a plaintiff] must have a severe impairment(s) that makes [her] unable to do [her] past relevant work . . . or any other substantial gainful work [i.e., SGA] that exists in the national economy." *See* 20 C.F.R. § 404.1505(a). SGA means work that "involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit." *See* 20 C.F.R. § 404.1510.

As discussed above, Plaintiff's first injury—to her neck—occurred on June 4, 2011, but Plaintiff returned to her past light-to-medium-exertional work as a produce manager on October 4, 2011, and continued to work nearly full time (34 hours per week) with no restrictions through July 26, 2012, the date of her second work-related injury, this time to her shoulder. (Tr. at 133, 136, 142-42, 148-49). While Plaintiff would have had significant limitations on her ability to work from June 4, 2011, through October 4, 2011, that was only a four-month period of time before she returned to her past work. Indeed, Plaintiff does not dispute the ALJ's finding that her work from October 2011 through July 2012 constituted SGA as evidenced by her earnings record showing earnings of $25,217.17 in 2011 and $18,160.45 in 2012. "As a matter of law," a person who is otherwise disabled ceases to be disabled when she engages in SGA. *Powell v. Heckler,* 773 F.2d 1572,

1576 (11th Cir. 1985).Thus, Plaintiff was not disabled from October 2011 through at least July 2012.

As also noted, Plaintiff stopped working again after she was injured a second time—this time to her shoulder—on July 26, 2012. Even if she could show that her second injury rendered her disabled beginning on her last day of work in July 2012, she cannot show that she was disabled at any time after April 26, 2013, when Dr. Greco released her from his care, opining that she could return to medium work with the permanent modified duties enumerated in the FCE. (Tr. at 269). Dr. Greco's treatment notes constitute substantial evidence in the record for the ALJ to find that Plaintiff was not disabled after April 26, 2013.

July 2012 to April 2013 is also less than one year. The regulations provide that where *unrelated* severe impairments develop sequentially, one following the other or with some overlap, *at least one impairment alone* must meet the twelve-month duration requirement. *See* 20 C.F.R. §§ 404.1522(a), 416.922(a) and SSR 82-52. Two unrelated impairments cannot be combined to meet the duration requirement. *See id.* Plaintiff's treating orthopedist, Dr. Greco, opined on multiple occasions that Plaintiff had two separate issues with the shoulder being separate from the neck. (Tr. at 274, 272, 271). Although Dr. Hash described the July 2012 injury as an exacerbation of her first neck injury, this impression was an initial one

done before testing. There is substantial evidence in the record to support the ALJ's finding that because Plaintiff had two separate impairments and neither one met the twelve-month durational requirement, the record did not show a period of disability for twelve consecutive months.

## B.    Subjective Complaints of Pain

Plaintiff argues that the ALJ erred in evaluating the severity of her impairments because he relied on the FCE without considering (1) Dr. Greco's statement at their last visit on April 26, 2013, that she continued to have neck issues or (2) her own subjective complaints of pain.

A claimant's subjective testimony of pain and other symptoms will support a finding of disability if it is supported by medical evidence that satisfies the pain standard and is not discredited by the ALJ. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). To satisfy the pain standard, a claimant must show "evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that it can reasonably be expected to give rise to the alleged pain." *Id.* at 1560; *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Once the pain standard is satisfied, the ALJ must consider a claimant's subjective testimony of pain and other symptoms. *Foote*, 67

F.3d at 1560; *see also Minter v. Astrue*, 722 F. Supp. 2d 1279, 1282 (N.D. Ala. 2010) (finding that "if a claimant testifies to disabling pain and satisfies the three part pain standard, he must be found disabled unless that testimony is properly discredited"). If the ALJ discredits the claimant's subjective testimony of pain and other symptoms, he must articulate explicit and adequate reasons for doing so. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* Soc. Sec. Rul. 96-7p, 1996 WL 374186 (1996) ("[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements."). "Although [the Eleventh Circuit] does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court." *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d at 1562).  The ALJ is not required to cite "particular phrases or formulations" in his credibility determination, but it cannot be a broad rejection that is insufficient to enable this Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.*

In this case, the ALJ cited the relevant regulations, considered Plaintiff's allegations in relation to the other evidence, and articulated reasons for finding her allegations not totally credible, which shows that he properly applied the Eleventh

Circuit pain standard.  (Tr. at 13-14). The ALJ found that while Plaintiff had "medically determinable impairments [which] could reasonably be expected to cause the alleged symptoms . . . [her] statements concerning the intensity, persistence [*sic*] and limiting effects of these symptoms" were not credible. (Tr. at 14).

Plaintiff emphasizes that at her hearing she testified that she experiences chronic constant pain, an eight out of ten in severity, and completely disabling pain three to five days per week. (Tr. at 36-37.) She says that on the days she experiences disabling pain, it limits her to 15-20 minutes of activity at a time, after which she can sit comfortably for 15-20 minutes at a time. (Tr. at 37, 40-42). Further, she claims that after several surgeries, epidural steroid shots, physical therapy, and current use of Norco and Percocet, her pain is not relieved. (Tr. at 46). Plaintiff contends that her increased pain levels resulting from a return to work after surgery support her subjective complaints of pain.

While Plaintiff relies on her testimony and complaints, the work history and medical evidence do not support her allegations. As noted by the ALJ, despite complaints of disabling limitations, Plaintiff was able to work for nine months from October 2011 through July 2012. (Tr. at 133, 136, 142-43, 148-49). Although she argues that her pain worsened when she began working again, her physicians

repeatedly cleared her for work with various levels of modified duties. Further, nine months after Plaintiff's July 2012 injury and three months after surgery, her orthopedist, Dr. Greco, noted that she had much better motion and had definitely improved, and he released her from his care with permanent modified duties for medium work. (Tr. at 269).

Plaintiff also argues the ALJ erred because he relied on the FCE without considering Dr. Greco's assessment on their last visit in the record that she continued to have neck issues. However, Dr. Greco himself relied upon the results of the FCE, noting she had modified work duty "as per her FCE restrictions permanent." (*Id.*) In any event, the ALJ actually limited Plaintiff to more restrictions than the FCE provided. The ALJ limited her to the performance of no more than light work, which requires lifting no more than 20 pounds with only occasional overhead lifting, while the FCE allowed for medium work, lifting between 35 and 45 pounds and frequent overhead reaching. Additionally, Dr. Greco's observation about her continuing neck issues does not undermine his overall opinion that she had improved greatly, that he could release her from his care, and that she could perform medium work with additional restrictions. (*Id.*)

The ALJ also noted that additional evidence raises questions about Plaintiff's credibility. Plaintiff provided conflicting information to her doctors. On

August 31, 2011, several weeks after her neck surgery, Plaintiff reported to Dr. Ghavam that she was doing well with good relief of right upper extremity pain. (Tr. at 208). Yet, a year later, on August 22, 2012, Plaintiff told Dr. Hash that her pain had never improved after her prior 2011 surgery. (Tr. at 233). She also reported to Dr. Hash that she had continued to work with no restrictions since the June 4, 2011, neck incident, which was not true. (Tr. at 226.) Additionally, when Dr. Ghavam was treating her for her neck injury, she complained of "diffuse pain right arm with parathesia, weakness, and numbness" post-surgery. (Tr. at 204). However, at her visit with Dr. Hash in November 2012, Plaintiff denied having had any problems with her shoulder prior to her July 26, 2012 work injury. (Tr. at 276). Plaintiff also did not cease smoking as advised by her doctors, did not use the bone growth stimulator prescribed by Dr. Hash, was discharged from another doctor's care for violating a narcotics contract, and actively resisted exercising during physical therapy which slowed her progress considerably. (Tr. at 206, 233, 302-320.) These instances of noncompliance indicate that Plaintiff's pain was not as debilitating as she alleges. The ALJ's credibility determination is supported by substantial evidence.

Upon review of the record and consideration of the ALJ's decision with respect to Plaintiff's credibility, the ALJ articulated "explicit and adequate

reasons" for discrediting Plaintiff's testimony. *Wilson*, 284 F.3d at 1225. Those reasons are supported by substantial evidence.

## IV.   Conclusion

Upon review of the administrative record, and considering all of Plaintiff's arguments, the Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law.  A separate order will be entered.

**DONE** AND **ORDERED** ON MARCH 17, 2017.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704